OLEG CASSINI, INC., Plaintiff,

v.

COUTURE COORDINATES, INC., Isadore Dion and Charles Coen, Defendants.

No. 69 Civ. 26.

United States District Court

S. D. New York.

March 6, 1969.

Booth, Lipton & Lipton, New York City, for plaintiff; Donald S. Engel, New York City, of counsel.

Strasser, Spiegelberg, Fried & Frank, New York City, and Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendants; Matthew Gluck, New York City, H. Robert Fiebach, Philadelphia, Pa., of counsel.

## OPINION

HERLANDS, District Judge:

By this application for an injunction *pendente lite*, plaintiff, Oleg Cassini, Inc., seeks to enjoin defendant,[1] Couture Coordinates, Inc. (hereinafter "Couture" or defendant), and its officers, agents, employees, successors, assigns and all persons in concert with them from using the trademark OLEG CASSINI or any other name including the word OLEG or the word CASSINI or any other colorable imitation of plaintiff's registered trademark OLEG CASSINI, on clothing, accessories or any other products, or from otherwise infringing plaintiff's trademark.

The complaint, alleging trademark infringement, demands a permanent injunction, an accounting, treble damages and costs. Defendant has demanded a trial by jury.

For the reasons set forth below, the Court denies the application.

*Statement of Facts*

This opinion sets forth the findings of fact and conclusions of law which constitute the grounds of the Court's action. Fed.R.Civ.P. 52(a).

Plaintiff, a New York corporation, is engaged in the business of designing and authorizing the manufacture and distribution of men's and women's clothing, accessories and other items, under the

---

1. The complaint joins Charles Coen and Isadore Dion as defendants. Neither was served with the order to show cause signed by this Court on January 6, 1969; and, therefore, they are not before the Court on this application.

trademark OLEG CASSINI. Mr. Oleg Cassini, a well-known designer of women's clothing, is sole shareholder in plaintiff corporation.

Plaintiff registered its trademark OLEG CASSINI in the United States Patent Office on August 27, 1958, registration No. 650952 and on January 21, 1958, registration No. 657489.

Defendant, Couture, is an independent manufacturer and designer of women's sportswear. It is a Pennsylvania corporation; its principal place of business is in Pennsylvania. Prior to June 1967, all of the issued and outstanding stock of Couture was owned by Charles Coen or by members of his family.

For some time prior to June 1967, Couture had been operating under a license from plaintiff for the manufacture of women's sportswear with the OLEG CASSINI trademark.

In June 1967, Couture was insolvent and indebted to plaintiff in an amount in excess of $70,000, representing royalty obligations under its license agreement with plaintiff.

In June 1967, Penn Garment Manufacturing Co., Inc. (hereinafter "Penn"), by purchases of Couture stock, became a dominant shareholder of Couture.[2]

Isadore Dion is the president of both Couture and Penn.

On June 1, 1967, plaintiff entered into a new license agreement with Couture wherein plaintiff granted to Couture the sole and exclusive license to use the trademark OLEG CASSINI and all registered trademarks and tradenames connected with the use of the name OLEG CASSINI, in connection with the manufacture, production and sale of certain women's sportswear, for a term of ten years. (The License Agreement is annexed as Exhibit C to Mr. Cassini's affidavit, sworn to December 30, 1968, and will hereinafter be cited as "License Agreement".)

Defendant claims that, at the end of 1967 or the early part of January 1968, Oleg Cassini requested defendant to relinquish its rights with respect to certain items which defendant had the exclusive license to produce under the License Agreement. Mr. Dion allegedly refused to relinquish these rights on behalf of Couture and now asserts that Mr. Cassini stated that "he would refuse to approve our line and would put us out of business." (Dion Opposing Affidavit, sworn to January 17, 1969, ¶ 3.)[3]

Sometime in January 1968[4] Mr. Cassini and other representatives of plaintiff visited Couture's showroom in New York and notified Couture's employees that plaintiff disapproved thirty-nine styles

2. Plaintiff's complaint alleges, on information and belief, that Dion and Charles Coen are officers of and the sole shareholders of Couture. (Complaint, ¶ 2.) Defendant, by affidavit of Isadore Dion and in its answer, denies that either Dion or Coen is a shareholder and alleges that Penn is the sole shareholder of Couture.

A receivership proceeding has been brought by Charles Coen against defendant Couture in the Pennsylvania state courts in which the ownership of shares in Couture is in dispute. (Dion's Affidavit, sworn to January 9, 1969, Exh. A.) There is apparently no question in that action that Penn does indeed own a dominant portion of Couture stock; the question to be litigated is whether Coen still owns any shares. This is immaterial to the motion before this Court, and no determination is made thereon. It is sufficient to recognize, for the purposes

of the elaboration of the facts, that Penn is in fact a shareholder of defendant, and that Isadore Dion is president of both corporations.

3. Plaintiff neither denies nor admits this allegation made in defendant's papers submitted in opposition to this motion. The Court does not, however, find this fact, as it is unnecessary to the decision on the motion.

4. On January 10, 1968, by letter, plaintiff's attorneys demanded that defendant desist from unlawfully, using the OLEG CASSINI trademark on its letterhead, a practice not permitted by the License Agreement. Apparently, plaintiff had not found use of the letterhead objectionable between June, 1967 and January, 1968. Nevertheless, defendant ceased using the letterhead. See Biegen Affidavit, Exhs. 1, 2; Dion Affidavit, January 17, 1969, ¶ 2.

that had been prepared by Couture. (Cassini Affidavit, sworn to December 30, 1968, ¶ 13; Cassini Affidavit, sworn to January 13, 1969, ¶ 5; Peggy Nestor Affidavit in Support of Motion, sworn to January 13, 1969, ¶ 4; Dion Affidavit, sworn to January 17, 1969, ¶ 3).

Subsequently, by letter dated January 19, 1968, plaintiff's attorneys notified defendant that the thirty-nine specified styles were unacceptable to plaintiff and could not be sold under the Cassini label. The letter also indicated that any modification of these styles would have to be approved by Mr. Cassini, in accordance with the terms of the License Agreement. (Dion Affidavit, sworn to January 17, 1969, Exh. C.)

Mr. Cassini contends that defendant never re-submitted the designs as required, and that, between January and June, 1968, he repeatedly pointed out to Mr. Dion violations of the Licensing Agreement, such as, failure to submit samples, poor merchandise quality and workmanship, and sales to discount stores. (Cassini Affidavit, sworn to January 13, 1969, ¶ 6.)

Mr. Dion alleges that he eventually agreed, on behalf of Couture, to relinquish some of its rights under the License Agreement; and, after so doing, Mr. Cassini and other representatives of plaintiff re-reviewed the disapproved line of clothing and approved the entire line, including the thirty-nine styles that were the subject of the letter of January 19, 1968. (Dion Affidavit, sworn to January 17, 1969, ¶ 3.) Defendant also asserts that at no time after January 19, 1968, orally or in writing, did plaintiff note disapproval of any of defendant's styles and at no time did Couture manufacture and sell any merchandise which had not been approved. (Dion Affidavit, sworn to January 17, 1969, ¶ 6.)

In a letter dated February 5, 1968, attorneys for plaintiff suggested that a meeting be held with defendant to discuss defendant's sale of Cassini merchandise to outlet stores in violation of the License Agreement. (Arnold I. Biegen Affidavit in Support of Motion, Exh. 4.) There is no indication that such a meeting ever took place.

Apparently for several months prior to May 16, 1968, negotiations took place between plaintiff and Penn regarding the possibility of an exclusive license arrangement for certain Cassini merchandise. (Dion Affidavit, sworn to January 9, 1969, Exh. B.) Mr. Cassini and Mr. Dion were the negotiating parties.

Defendant failed to pay the minimum royalty which was payable under the terms of the License Agreement on February 15, 1968, or within the following fifteen days. Apparently no objection was made to the delay in payment; and, on March 11, defendant paid the amount owed. Thereafter, defendant tendered no royalty payments until July 26, 1968.

Defendant claims that, in late March or April 1968, it informed Mr. Cassini that "Couture was tight for cash and that it would not be able to meet its royalty obligations for the next few months." Mr. Dion asserts that "Mr. Cassini stated that would be all right because he is not concerned and he is confident that plaintiff would eventually be paid." (Dion Affidavit, sworn to January 17, 1969, ¶ 5; Dion Affidavit, sworn to January 9, 1969, ¶ 6.)

On the other hand, Mr. Cassini denies that Mr. Dion ever informed him that Couture was "tight for cash"; and he asserts that quite to the contrary, Mr. Dion assured him that Couture was financially sound.[5] (Cassini Affidavit, sworn to January 13, 1969, ¶ 9.)

5. Mr. Cassini also states that at some unspecified time during the negotiations regarding Penn and plaintiff, Mr. Dion informed him that Couture was current in its royalty payments, and that, in fact, the most recent check was in the mail. The inference Mr. Cassini wishes the Court to draw is that defendant was in fact hiding its delinquency in royalty payments. Firstly, it is not plausible that a corporation would keep account of moneys owed to it by simply asking its licensee whether payments were being made, especially in view of the $70,000. debt owed by defendant to plaintiff. Secondly, this conversation may very well have

On May 16, 1968, plaintiff and Penn entered into an exclusive license agreement for Penn to manufacture Cassini-designed junior dresses in a given wholesale price range. (Dion Affidavit, sworn to January 9, 1969, Exh. B.)

On July 1, 1968, plaintiff's attorneys wrote a letter to defendant advising it that the License Agreement was cancelled by reason of several defaults, including distribution to discount houses and close-out stores; inferior execution of garments; and derogation of the Cassini name by attempts to dissuade persons from purchasing the line then being manufactured by Penn. (Biegen Affidavit, Exh. 5.)[6]

Attorneys for Couture responded to this letter in a letter dated July 9, 1968, informing plaintiff that Couture was not in default under its contract and that the attempt to terminate was without effect.

On July 18, 1968, plaintiff's attorneys again wrote to defendant.[7] In relevant part, that communication stated:

"Our client advised us that you have not made any payments upon your royalty obligation in the past five months and you are hereby advised that your default is noted.

Since your payments are more than fifteen days overdue the licensor, Oleg Cassini, Inc., hereby elects to terminate your license and all of your rights arising thereunder." Biegen Affidavit, Exh. 7.

In their letter dated July 23, 1968, defendant's attorneys indicated that they considered the attempted termination of the License Agreement ineffective and that they intended to cure the delinquency in royalty payments immediately.

On July 24, 1968, plaintiff's attorneys took the position that plaintiff, by its letter of July 18, 1968, had effectively elected to terminate the agreement and requested a schedule of defendant's inventory of Cassini merchandise.

On July 26, 1968, Couture sent a check to plaintiff for all royalties due. That check contained the following indorsement:

"This check covers all monthly minimum royalties to date under Agreement between Oleg Cassini, Inc. and Couture Coordinates, Inc., dated June 1, 1967, and acceptance by the payee shall constitute an acknowledgment that no default exists under the agreement." Dion Affidavit, sworn to January 9, 1969, Exh. C.

Plaintiff orally acknowledged receipt of the check, but did not cash it or return it. In a letter dated August 9, 1968, plaintiff's attorneys informed defendant that the check was unacceptable because the restrictive endorsement allegedly referred to curing all defaults instead of being limited to monetary defaults. (Biegen Affidavit, Exh. 11.)

Couture made no further tender of royalty payments.

On August 9, 1968, Penn filed suit against plaintiff in the Eastern District of Pennsylvania, naming Couture as garnishee. (Dion Affidavit, sworn to January 9, 1969, Exh. D.)

On August 19, 1966, Couture was served with a writ of foreign attachment by a federal marshal. (Defendant's Answer, ¶31.) Notice of the Attachment was given to plaintiff. (Plaintiff's Reply, ¶9.) In October 1968, receivership proceedings were instituted against Couture in the Pennsylvania state courts.

---

taken place sometime before March 11, 1968, when in fact Couture's then currently owed payment was in fact "in the mail". *See* Cassini Affidavit, sworn to January 13, 1969, ¶ 8; Dion Affidavit, sworn to January 17, 1969, ¶ 5.

6. The letter was sent to Charles Coen at a New York address rather than to defendant's Pennsylvania address. The let-

ter was apparently promptly transmitted. The Court rejects defendant's claim that, apart from other considerations, plaintiff's failure to comply with the notice provisions of the License Agreement is enough to render the letter ineffective. *See* License Agreement, ¶ 22.

7. Plaintiff sent the letter to Charles Coen. *See supra,* n. 6.

Defendant has admitted that, during the period between July 1, 1968 and January 9, 1969, it has continued to sell merchandise with the Cassini trademark. This Court issued a temporary restraining order to prevent defendant from making further sales of Cassini merchandise pending the determination of this motion.

This Court has jurisdiction pursuant to the provisions of 15 U.S.C. §§ 1114–1127 (1964) and 28 U.S.C. § 1338(a) (1964).

*Discussion*

■ To warrant the extraordinary relief of a preliminary injunction, plaintiff must show, by the weight of the evidence, that there is a reasonable probability that it will succeed at the trial on the merits and that denial of the prayed for injunctive relief will result in irreparable and immediate injury to it. *See, e. g.,* Symington Wayne Corp. v. Dresser Industries, 383 F.2d 840 (2d Cir. 1967); Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 1 A.L.R.3d 752 (2d Cir. 1962); Garland v. Ruskin, 249 F.Supp. 977, 981 (S.D.N.Y.1965); Nadya, Inc. v. Majestic Metal Specialties, Inc., 127 F.Supp. 467 (S.D.N.Y.1954).

On the record now before this Court, the Court concludes that plaintiff has failed to establish a reasonable probability of success on the merits and has failed to show, by a fair preponderance of the credible evidence, that irreparable injury would flow from a denial of a temporary injunction.

■ Plaintiff claims that, either by its letter of July 1, 1968 or of July 18, 1968, it effectively elected to terminate its contract with defendant. If the Court were so to find, then defendant by its own admission has infringed plaintiff's trademark. The License Agreement provides that, upon termination of the agreement, defendant is entitled to dispose of its inventory of Cassini merchandise then on hand during a period of three months.

(License Agreement, ¶7.) Any use of a trademark after expiration of a license is, of course, an infringement of the trademark, *see, e. g.,* Smith v. Dental Products Co., 140 F.2d 140, 149 (7 Cir. 1944); 3 R. Callman, Unfair Competition and Trade-Marks § 78.2, at 1307 (Supp. 1965), and, in an appropriate case, would warrant intervention of a court of equity. Defendant, however, earnestly contends that plaintiff could not, and did not, effectively elect to terminate the License Agreement which, according to defendant, is still in force; and that, therefore, defendant's continued sale of Cassini merchandise with the Cassini label is non-infringing.

For plaintiff to be entitled to an interlocutory injunction, it must show that, at the trial on the merits, the Court would probably find and conclude that plaintiff effectively terminated the License Agreement. For the reasons detailed below, the Court decides that plaintiff has failed to make such a showing.

*The letter of July 1, 1968*

At the hearing on plaintiff's application for a temporary restraining order and at the argument on this motion for a preliminary injunction, plaintiff relied primarily on the letter of July 18, 1968. However, in its papers submitted in support of its motion and in its complaint, plaintiff does not abandon its assertion that it was its letter of July 1, 1968 that constituted an effective termination of the License Agreement; and the Court disposes of this aspect of plaintiff's argument first.

The parties are in sharp dispute about the nature and extent of Mr. Cassini's supervision and approval of defendant's designs. Mr. Cassini asserts that he has maintained strict supervision and control over the quality of defendant's product in accordance with plaintiff's rights under the contract. (Cassini Affidavit, sworn to December 30, 1968, ¶9; License Agreement, ¶8.) Mr. Dion, on the other hand, claims that Mr. Cassini's control of

the quality of the Cassini merchandise was occasional and lax.[8] What is clear and undisputed is that on January 19, 1968, Mr. Cassini did notify defendant by letter that thirty-nine specific styles were unacceptable to plaintiff and requested that defendant rectify the situation.

8. Defendant intimates that plaintiff's failure to supervise the use of its trademark under the License Agreement may, in fact, constitute a relinquishment of any further rights. in the trademark. *See* Defendant's Memorandum. of Law, at 16. The Court does not adjudicate this contention, as it is based solely on the affidavit of Mr. Dion, and is controverted by the affidavits of Mr. Cassini and Peggy Nestor.

9. All the relevant provisions in the License Agreement, which are referred to in this opinion, are set forth below.

"8. STANDARDS OF CASSINI MERCHANDISE, APPROVAL.

(a) Cassini Merchandise shall at all times be of the highest quality and shall be manufactured * * *

(b) ·Licensor shall have the right to approve and supervise the styles, designs, contents, workmanship and quality of all Cassini Merchandise to insure that Cassini Merchandise manufactured, sold or distributed by Licensee enhances and preserves the reputation and prestige of the name 'Oleg Cassini' as a designation for highest-quality products.

(c)ͺ Licensee agrees to furnish free of cost a sample supply of each product intended to be manufactured * * *

(d) In the event that Licensor shall deem a sample furnished by Licensee pursuant hereto to be inferior in materials, design, quality or workmanship to the standards required by Licensor to insure that Cassini Merchandise be of highest quality, then, and in such event, Licensor may give notice in writing to Licensee within ten days after delivery of the sample by Licensee. In the event that Licensor shall not have given such written notice to Licensee within such ten day period, the sample shall be deemed to have been approved.

(e) Upon receipt of a notice by Licensor pursuant to subparagraph (d) hereof (i) in the case of a product which has not previously been sold by Licensee or a modification of a product which has previously been sold by Licensee hereunder, Licensee will not sell or distribute such product or modification until it shall have been approved in writing by Licensor, and (ii) in the case

The License Agreement provides [9] that, where such a written notice is received by defendant, defendant will not sell or distribute the disapproved product until it shall have been approved in writing by the licensor. License Agreement, ¶ 8 (e).) The parties disagree as to

of products being sold as Cassini Merchandise, Licensee will remedy each deficiency set forth in such notice within sixty days after such notice in a manner satisfactory to Licensor, which satisfaction shall be expressed in writing, or Licensor shall have the right to terminate this Agreement by written notice.

\* \* \* \* \*

16. DEFAULT. (a) If Licensee shall fail to make any payment whether of Minimum Royalty or Percentage Royalty, due hereunder, and if such default shall continue for a period, of fifteen days, or if Licensee shall otherwise fail to perform any of the terms, conditions, agreements or covenants in this Agreement on its part to be performed, and such default shall continue for a period of sixty, days after the mailing of written notice by Licensor specifying such default, then, and in such event, unless any such default shall have been remedied by Licensee within the applicable period, as aforesaid, Licensor may at its sole election terminate this Agreement forthwith.

\* \* \* \* \*

(c) Licensee acknowledges that failure of Licensee to cease the manufacture, sale or distribution of Cassini Merchandise, except as herein permitted, upon the termination of this Agreement for any reason whatsoever, will result in immediate and irrevocable damage to Licensor and to the rights of other licensees of the Licensed. Marks. Licensee also acknowledges that Licensor will have no adequate remedy at law for such failure and in the event of any such failure, Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and such other and further relief as any court of competent jurisdiction may deem just and proper.

\* \* \* \* \*

19. WAIVER. No waiver by either party, whether express or implied, of any provisions of this Agreement or of any breach or default of either party, shall constitute a continuing waiver of such provision or of a waiver of any other provisions of this Agreement."

whether, in fact, Mr. Cassini did ultimately approve the thirty-nine styles. The Court cannot resolve the factual dispute at this time. It is, however, clear that Mr. Cassini did not indicate approval in writing as provided for in the agreement.[10] Couture does not deny that, after some time, it did manufacture and sell the styles specified in the letter of January 19, 1968; but it claims that it did so with plaintiff's approval.

In order for plaintiff to hold Couture in default of the agreement on account of a violation of ¶8(e), plaintiff would have to comply with the provisions set forth in ¶16 of the agreement entitled DEFAULT. Subparagraph (a) of this provision provides, in pertinent part, that, if defendant fails to perform any of the terms of the agreement (other than non-payment of royalties), and if this default continues for a period of 60 days after the mailing of written notice by the licensor specifying such default, then, unless the default is remedied within the applicable period of 60 days, the licensor may, at its sole election, terminate the agreement.

The letter of January 19, 1968 did not specify any default under the agreement. It indicated only that the styles enumerated therein were disapproved by plaintiff. Under the agreement, the only consequence flowing from such disapproval is a prohibition of manufacture and sale until approval is secured. A default would occur if defendant failed to re-submit the designs for review and proceeded to manufacture and sell them without such approval. Assuming *arguendo* the Court were to accept plaintiff's

description of the events—that defendant never re-submitted the line for approval and plaintiff never gave its approval—plaintiff never mailed a written notice of this alleged default to the licensee, as required under ¶16(a). The only written *communication to defendant after the* letter of January 19, 1968 was the letter of July 1, 1968 in which plaintiff sought to terminate the agreement. This letter itself simply asserted that "your [defendant's] execution of the garments has been inferior." (Biegen Affidavit, Exh. 5.) There is no reference to any wrongful manufacture and sale of the formerly disapproved line. And even if there were, plaintiff would be required under the terms of the contract to give defendant 60 days in which to correct the alleged default.

If, on the other hand, the letter of July 1, 1968 was intended by plaintiff to specify general defects in quality, these too could constitute grounds for termination of the agreement only after written notice to defendant of such defaults and failure of defendant to remedy them within 60 days.[11]

■ The Court finds and concludes that the letter of July 1, 1968, in which plaintiff purported to terminate the License Agreement with defendant, did not effect such a termination.

### The Letter of July 18, 1968

■ The basic issues presented to the Court concerning the effect of the letter of July 18, 1968 are ones of contract law. The License Agreement, by its terms, makes the laws of the State of New York the applicable law to the construction [12]

---

10. If defendant proves, at the trial on the merits, that plaintiff orally granted approval of the styles, a Court might hold that plaintiff waived its right to grant approval in writing only, as this provision was solely for plaintiff's benefit.

11. Similarly, in order for plaintiff to hold defendant in default of the provisions in the contract with respect to sale to discount houses, plaintiff is required, under the contract, to give defendant 60 days in which to remedy the default. The letter of July 1st failed to do this.

In addition, the Court does not consider plaintiff's letter of February 5, 1968 as a notice of default for sale to discount houses. For a discussion of the alleged unlawful sales to discount houses see the Court's footnote 21, *infra*.

12. The contract consists of plaintiff's printed form; and, therefore, under, New York law, all ambiguities are to be resolved in favor of defendant. *See*, Rentways, Inc. v. O'Neill Milk & Cream Co., 308 N.Y. 342, 126 N.E.2d 271 (1954).

of the agreement. (License Agreement, ¶24.)

Plaintiff argues that, because defendant failed to pay the minimum royalties owed under the contract for a period of five months, plaintiff could at any time elect to terminate the agreement, and that it did so in its letter of July 18, 1968. Plaintiff denies that it ever orally waived the requirement of prompt payment on the 15th of every month, and maintains that, despite its failure to demand payment or to elect to terminate at the onset of defendant's defaults, the License Agreement provides that "no waiver by either party, whether express or implied, of any * * * default * * * shall constitute a continuing waiver * * *" (License Agreement, ¶19) and that, consequently, plaintiff could elect to terminate at any time.

Putting aside for the moment the disputed question whether plaintiff at any time orally waived prompt payment of royalties, the Court turns to the undisputed conduct of the parties during the period from February 15, 1968 to July 18, 1968. It is on the basis of this conduct that plaintiff seeks interlocutory relief.

On February 15, 1968, defendant failed to pay the minimum royalty, and did not cure the default during the following 15 days. (License Agreement, ¶16(a).) The License Agreement provides that, if failure to pay royalties continues for a period of 15 days, the licensor may elect to terminate the agreement. Plaintiff does not claim that it objected to the delay in payment nor apparently did it comment on the delay when defendant made payment on March 11, 1968.

■ Having thus accepted the payment of March 11th, plaintiff cannot base any claim of default in delaying payment on the February 15th installment.[13] *See* 3A A. Corbin, Contracts § 722 (Supp. 1965); *cf.* St. Regis Paper Co. v. Santa Clara Lumber Co., 186 N.Y. 89, 78 N.E. 701 (1906).

■ From March 11, 1968, until July 18, 1968, defendant never tendered any payments of minimum royalties; and plaintiff never objected to the delay in payment. Mr. Cassini and his representatives[14] were, during this period, negotiating with Mr. Dion, president of Couture and of Penn, with respect to the prospective license agreement with Penn, which eventually was entered into on May 16, 1968. It surpasses belief that plaintiff was unaware of the defaults in royalty payments; and it is highly implausible that it would have entered into an agreement with Penn, a dominant shareholder in defendant, if it was concerned with defendant's financial status. This is not to suggest that plaintiff irrevocably waived its right to royalty payments or to prompt payment of royalties. It is, however, clear that, from March 11, 1968 until July 18, 1968, plaintiff's conduct—delineated in this record—constituted a waiver of the provision in the contract calling for prompt payment of royalties.

■ A party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for his benefit, *see, e. g.,* Arrow Plumbing Co., Inc., v. Dare Construction Corp., 212 N.Y.S.2d 438 (Sup. Ct. 1961); Universal C.I.T. Credit Corp. v. Greyhound Rent-A-Car, Inc., 39 Misc. 2d 163, 240 N.Y.S.2d 205 (Sup.Ct.1963); and no consideration is necessary for such a waiver to be effective. *See generally,* 3A A. Corbin, Contracts §§ 752, 753 (Supp. 1965).

13. The contract provides for a minimum royalty to be paid by Couture to plaintiff in the amount of $35,000. per year, to be paid in equal monthly installments of $2,916.66 payable on the 15th day of each month, commencing June 15, 1967.

That agreement also provides for a percentage royalty to be paid only in the event that Couture's sales resulted in the imposition of a royalty obligation beyond the minimum royalty. This contract provision is not currently in issue.

14. Igor Cassini, Oleg Cassini's brother, apparently negotiates on behalf of plaintiff.

■■ Even where time of performance or time of payment is of the essence in a contract, as here, the New York authorities have held that the conduct of the parties may be such as to indicate a waiver of the condition; and, once manifested, it may not be suddenly abandoned.[15] *See, e. g.,* General Electric Co. v. Nat'l Contracting Co., 178 N.Y. 369, 70 N.E. 928 (1904); Thomson v. Poor, 147 N.Y. 402, 42 N.E. 13 (1895); Lawson v. Hogan, 93 N.Y. 39 (1883).

"By the waiver time, as an essential element of the contract, has been removed therefrom, but it can be restored by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with."

Taylor v. Goelet, 208 N.Y. 253, 258, 101 N.E. 867, 868 (1913); *accord,* Schmidt v. Reed, 132 N.Y. 108, 30 N.E. 373 (1892); Brede v. Rosedale Terrace Co., 216 N.Y. 246, 110 N.E. 430 (1915).

■ The requirement of notice is not obviated by or inconsistent with a clause in a contract providing that a waiver shall not constitute a continuing waiver. This clause is construed to mean that once a party waives a provision, such a waiver is not to have a permanent effect and the party can reinstate his contractual right to strict performance of the contract according to its terms.

By failing to object to the non-payment of royalties over a period of four months, plaintiff waived its right to performance within the stipulated time. Plaintiff could not thereafter put defendant in default without first demanding performance by defendant, thereby restoring

time as an element of the contract. Only then, if defendant failed to perform within a reasonable time, could plaintiff elect to terminate the agreement. Any other rule would be unjust.

■ Plaintiff's letter of July 18th purported to be a termination of the License Agreement. However, the Court finds and concludes that it is not effective as such. At a trial on the merits, a court might view this letter as constituting adequate notice to defendant that plaintiff intended to reinstate prompt payment as an element of the contract.[16] However, since plaintiff apparently did not intend the letter to have this effect, the letter did not contain a provision allowing defendant a reasonable time within which to make payments to cure past defaults. In such situations, the courts are disposed to impose a reasonable time limit for compliance. *See, e. g.,* Arnot v. Union Salt Co., 186 N.Y. 501, 79 N.E. 719 (1906); Berke v. Sherman, 213 N.Y.S. 2d 210 (Sup.Ct.1961); Schneider v. Rola Construction Co., Inc., 183 N.Y.S.2d 955 (Sup.Ct.1959). *See generally,* 3A A. Corbin, Contracts § 723 (Supp.1965).

■ In a letter dated July 23, 1968, defendant indicated its intent to affirm the contract and to satisfy its royalty obligations forthwith. Defendant tendered a check to plaintiff dated July 26, 1968, only eight days after plaintiff's purported election to terminate was sent. In this Court's view, such payment was made within a reasonable time.

The check was, however, restrictively endorsed in such a manner that a court would indeed be reluctant to require a party to accept the check at the peril of

---

15. The Courts look with disfavor on forfeitures and tend to find waiver where the conduct of the party claiming forfeiture or default warrants such a finding. *See, e. g.,* Taylor v. Goelet, 208 N.Y. 253, 259, 101 N.E. 867 (1913).

16. Upon fuller development of the facts at a plenary trial, the trial court might find that the July 18th letter—considered with the letter of July 1st, and with plaintiff's conduct during this period, *i. e.,* plaintiff's insistence that the con-

tract was effectively terminated and its failure to allow defendant time in which to cure defaults—constituted a wrongful termination of the contract by plaintiff, which would relieve defendant from the useless formality of making a tender of payment. *See, e. g.,* Mahnk v. Blanchard, 233 App.Div. 555, 253 N.Y.S. 307 (Sup. Ct.1931). This Court cannot make such a determination on the present state of the record.

forfeiting his rights to assert other defaults under the contract.[17] However, plaintiff notified defendant of its refusal to accept the check in a letter dated August 9, 1968, two weeks after tender of payment. In fact, plaintiff's entire approach to the situation was that the contract had been terminated by its letter of July 1, 1968 and by the subsequent letter of July 18, 1968; and it is unclear whether plaintiff would have considered the contract to be in force even if defendant's tender had been adequate and proper.

A court of equity does not favor forfeitures. There is substantial likelihood that, under the undisputed facts disclosed by the record now before this Court, a trial court might find that defendant was not in default on account of the improper tender but that defendant had a reasonable time within which to cure the tender. Plaintiff has not adduced any evidence of defendant's bad faith that persuades this Court to find otherwise, at least for purposes of the motion at bar.

■ On August 12, 1968, Penn filed a complaint in the Eastern District of Pennsylvania against Oleg Cassini, Inc., plaintiff herein, and named defendant Couture as garnishee. On August 19, 1968, Couture was served with a writ of attachment; and plaintiff was given notice thereof. In its reply to defendant's counterclaim, plaintiff denies any knowledge or information as to the effect of the attachment, but there is nothing in the record to indicate that the attachment has been lifted.[18] It does not appear, therefore, that defendant's failure to re-tender royalty payments after plaintiff's refusal to accept the restrictively endorsed check constitutes culpable default. Legal impossibility of performance, if proven at the trial, could constitute an adequate excuse for nonperformance.

■ The record before this Court presents complex questions of contract law which cannot be resolved without a full opportunity for thorough exploration of the relationship between the parties and their conduct. In order to resolve the question of the probability of plaintiff's success on the merits on the basis of *undisputed* facts in the present record, the Court has disregarded the possible existence of an oral waiver of prompt payment by plaintiff in the above analysis of the facts and the law as it may be applied to them. Plaintiff has failed to adduce proof sufficient to sustain a finding of its probable success on these undisputed facts. Moreover, the controverted facts regarding the oral waiver leave unanswered far too many relevant questions to warrant the grant of an interlocutory injunction. District courts have always been reluctant to determine doubtful questions of law and fact on an application for a preliminary injunction. *See, e. g., Evening News Publishing Co. v. Allied Newspaper Carriers,* 149 F.Supp. 460, 462 (D.N.J.1957); *American Radiator & Standard Sanitary Corp. v. Sunbeam Corp.,* 125 F.Supp. 839 (S.D. N.Y.1954).

17. Although defendant may, in good faith, have intended the endorsement to refer only to defaults in payment (*see* language of endorsement in text, *supra*, at p. 826), it would be unjust to require plaintiff to accept a payment which might in the future be the subject of conflicting interpretations.

However, the fact that the endorsement could be fairly read as limited to payment defaults, leads the Court to the conclusion that plaintiff should have immediately notified defendant of the check's infirmity so that defendant could have a reasonable time in which to remedy it.

18. On this record, the Court cannot consider the possibility that Penn, which may in fact be the sole shareholder in defendant, may have been guilty of bad faith in attaching the debt owed by defendant to plaintiff in order to avoid payment of the royalty obligation. The trial may disclose that defendant in fact intentionally and wrongfully placed itself into a position in which it was legally impossible for it to cure its delinquency in payment. On the present record, the Court cannot, however, find any probability of success on this aspect of the case.

*Irreparable Injury*

This Court will not issue a preliminary injunction where the movant has failed to show by a fair preponderance of the credible evidence that it will suffer irreparable and immediate injury if the injunction is denied. Plaintiff has convincingly established that the trademark OLEG CASSINI has acquired valuable good will with the public and that products bearing this name have acquired a reputation for high quality and style. Defendant does not dispute this. The relief that plaintiff seeks by the current motion is to prevent defendant from selling approximately $30,000. worth of merchandise bearing the Cassini label, because the three-month disposal period ended at the latest on October 18, 1968, and any use of Cassini labels constitutes trademark infringement.[19] If plaintiff's only claim were that the License Agreement was terminated because of a default in royalty payments, the Court would find against plaintiff on the claim of irreparable injury. This is not a case in which one manufacturer is making an infringing use of another's trademark and can thereby irreparably damage the good will attached to the product or "pass off" his goods as those of the holder of the trademark. In the case at bar, the licensee acquired the exclusive right to the use of the trademark in connection with the manufacture and sale of certain goods, with use of the mark subject to the licensor's approval as to quality and design. If the only default were one of prompt payment, an infringing use of the trademark in connection with the sale of the remaining inventory would be compensable at law because the type of damage customarily associated with trademark infringement would not result.[20]

However, plaintiff asserts that the inventory being presently offered for sale by defendant with plaintiff's label consists of merchandise which falls below the high standards of workmanship required by the License Agreement. If this is taken as true, then irreparable injury to the good will attached to the trademark would result. Plaintiff relies on the affidavits of Mr. Cassini as evidence that the merchandise is, in fact, of an inferior quality. In the circumstances of this case, considering the total record, the Cassini affidavits do not establish that asserted fact. As the Court's discussion has indicated, and the Court so finds, no convincing proof has been submitted to sustain the charge that the manufacture of the merchandise was actually inferior. This charge is sharply disputed by defendant, who claims that, after the letter of January 19, 1968, plaintiff approved the defendant's line of goods, and that it was not until July 1, 1968 that plaintiff indicated any dissatisfaction with the quality. At this point, plaintiff attempted to elect to terminate the agreement and gave defendant no opportunity to remedy the alleged defaults and, in fact, failed in any way to specify them. Plaintiff has not introduced any garments to illustrate its claim of inferior workmanship or styling. Defendant squarely challenges that claim.

Upon a qualitative analysis of the evidence, the Court finds and concludes that plaintiff has failed to make a sufficient showing on the issue of ir-

---

19. Defendant has not manufactured any new styles for distribution as Cassini merchandise; and the only infringement in controversy pertains to the remaining portion of the inventory on hand as of July, 1968.

20. The License Agreement contains a clause in which the licensee acknowledges that infringing use of the trademark will result in "immediate and irrevocable damage" to the licensor, and that licensor "will have no adequate remedy at law

* * *." This clause evidences a recognition of the good will attached to the trademark and the possible irreparable damage that an infringing use might cause to plaintiff. But it cannot operate to bind a court to a finding of irreparable injury under the circumstances presented herein where none is convincingly demonstrated by plaintiff. Nor can it preclude a licensee, in a proper case, from disputing the existence of irreparable injury. *See* discussion in A. Corbin, Contracts § 1432 (Supp.1965).

**834**

reparable harm;[21] and the facts must be developed at trial. *See, e. g.,* American Radiator & Standard Sanitary Corp. v. Sunbeam Corp., *supra.*

The Court does not now adjudicate the ultimate questions of fact and law, which will await a plenary trial. The present state of the record compels the Court to exercise its discretion to deny interlocutory relief.

The application herein for a preliminary injunction is hereby denied in all respects. The temporary restraining order is hereby vacated.

So ordered.

---

21. The Court finds it unnecessary to deal with defendant's contention that plaintiff's termination of the License Agreement was motivated by a desire to further an unlawful price-fixing scheme which defendant's conduct may have been frustrating.