CBS, INC. (CBS RECORDS
DIVISION), Plaintiff,

v.

Tanya Denise TUCKER, a minor, et
al., Defendants.

No. 75 Civ. 4694.

United States District Court,
S. D. New York.

Jan. 5, 1976.

Peter G. Eikenberry, New York City, for plaintiff.

Peter A. Herbert, Arrow, Silverman & Parcher, P. C., New York City, for defendants.

PIERCE, District Judge.

## OPINION

Plaintiff herein, CBS, Inc. (CBS Records Division, hereinafter "CBS"), has brought this action against Tanya Denise Tucker (hereinafter "Tucker" or "the infant"), a minor formerly under contract to plaintiff as a recording artist, Tanya, Inc., and Jessie Melvin Tucker and Alma Juanita Tucker, both individually and as guardians of Tanya Tucker. The complaint seeks a declaratory judgment, pursuant to 28 U.S.C. §§ 2201–02, first, as to the defendants' right to disaffirm the recording contract formerly in effect between Miss Tucker and CBS, and second, as to the rights of the plaintiff to the master recordings, copyrights and stock of records of Miss Tucker's performances.

The defendants have counterclaimed seeking a declaratory judgment as to Miss Tucker's right to disaffirm the contract and her right to the aforementioned recordings, copyrights, and records, an accounting by the plaintiff for all gross receipts received by the plaintiff from sales of records containing Miss Tucker's performances (less costs and royalties already paid), and both preliminary and permanent injunctive relief. It is the application for preliminary injunctive relief which is now before the Court.

Defendant Tucker [1] brought on her application for preliminary relief by order to show cause dated October 30, 1975. That application seeks a preliminary injunction prohibiting the plaintiff, in essence, from manufacturing, selling, distributing, or otherwise exploiting at prices or in packages not previously utilized, those phonograph records or other reproductions of the performances of the infant which have previously been released for sale or distribution, and from manufacturing, selling, distributing or otherwise exploiting at all, those phonograph records or other reproductions of the infant's performances which have not previously been released for sale and distribution.[2]

The Court signed the order to show cause, issued a temporary restraining order on consent of the parties, and set the matter down for a hearing on November 20, 1975. On that date, defendant was unable to proceed with witnesses. Accordingly, the hearing was adjourned to the following week, and again, at the request of counsel, to December 3, 1975. In each instance, the restraining order was extended by consent.

On December 3, 1975, the Court heard evidence for the better part of the day concerning the defendant's application, and reserved decision on the motion. Again, with the consent of the parties, the restraining order was extended pending the Court's decision on the motion for preliminary relief.[3]

The facts which are relevant to the issues before the Court on this motion are not complex and are largely undisputed. CBS and Tanya Tucker, who is now seventeen years of age (Tr. 62),[4] entered into a recording artist agreement (agreement) dated February 24, 1972. (Defendant's Ex. A.) The agreement was executed by Miss Tucker on March 3, 1972 when she was thirteen years of age. At the time the agreement was executed Miss Tucker was represented by Dolores Fuller with whom she had a contract for services as an agent, but she was not represented by an attorney. (Tr. 66–69.)

The agreement provided for a one year contract with two one year options, each of which CBS exercised. (Ex. A.) During the contract period, which ran until on or about March 15, 1975, Miss Tucker recorded approximately forty-eight master recordings for CBS. (Tr. 69.) Seven or eight of these recordings, which were made in January, 1975, remain unreleased at the present

---

1. While four defendants are named in this action, the relief sought on the present motion is relevant only to the defendant Tanya Tucker. In particular, issues concerning the validity and force of a purported guarantee of Miss Tucker's contract, which was executed by her guardians, are not before the Court on this motion.

2. The injunction sought would prohibit CBS from: "(a) Manufacturing, selling, distributing, or otherwise exploiting those phonograph records, recordings, tapes or other forms of mechanical or electronic reproductions of the performances of Tanya Denise Tucker, an infant, which have been previously released for sale and distribution to the general public at prices, or configurations, or packages or in any

other manner not heretofore utilized in the sale, distribution and exploitation of such recordings; and

"(b) manufacturing, selling, distributing or otherwise exploiting those phonograph records, recordings, tapes or other forms of mechanical or electronic reproductions of the performances of Tanya Denise Tucker, an infant, which have not been previously released for sale and distribution to the general public."

3. Counsel stipulated on the record that certain recordings were not within the terms of the restraining order and were not objected to by the defendant.

4. "Tr." refers to transcript pages from the hearing on December 3, 1975.

time. (Tr. 140.) During the contract period, CBS expended considerable sums and substantial effort in promoting the infant's career as a recording artist, including merchandising, marketing, and publicity efforts which were directed from CBS headquarters in New York and implemented on a nationwide basis. (Tr. 170–75, 180–182, 191–93.)

There is no dispute that both parties have benefitted from this agreement. Miss Tucker, who had been unknown before entering into the agreement, became a star in the recording industry and has earned approximately $110,000 in royalties from CBS since entering the agreement. (Tr. 62–63, 70.) According to the terms of the agreement, she will continue to be entitled to royalties from the sales of her CBS recordings as long as her recordings are sold by CBS. (Ex. A.) CBS has also profited from the arrangement, having recouped certain of its recording expenses from Miss Tucker's royalties, pursuant to the agreement, and having earned a profit as well. (Tr. 70, 182–84.)

On or about October 10, 1974, prior to the expiration of the CBS agreement, Miss Tucker signed a recording artist agreement with Music Corporation of America (MCA), the company with which she now records. (Tr. 62, 73.) However, although she had signed with MCA, she performed all of the remaining recording obligations under her CBS contract and did not record at all for MCA until after March 15, 1975 when the final option of the CBS agreement expired. (Tr. 73–74, 127.)

Since Miss Tucker's departure from CBS, MCA has released two single recordings which Miss Tucker had recorded for her new company. In each instance, according to Miss Tucker's testimony, CBS released one of the previously unreleased Tucker recordings in its stock at approximately the same time. (Tr. 83, 98–99.) It was after these occurrences that Miss Tucker sent to CBS a letter dated July 15, 1975, which proved to be the genesis of this lawsuit. (Ex. B.) In that letter, Miss Tucker purported to assert her right as an infant to

disaffirm a contract made during infancy, and demanded the return and/or assignment to her of all master recordings, copyrights, and stocks of records, as well as an accounting for profits and a cessation of distribution of her records by CBS. On September 24, 1975, CBS filed its complaint in the instant action.

■ The issuance of a preliminary injunction constitutes the award of extraordinary relief. *Sanders v. Air Line Pilots Assn., Int'l,* 473 F.2d 244, 248 (2d Cir. 1972); *Heldman v. United States Lawn Tennis Assn.,* 354 F.Supp. 1241, 1249 (S.D.N.Y. 1973). Its purpose is to preserve the *status quo* between the parties pending final determination of the merits of the action. *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 742 (2d Cir. 1953); *Columbia Broad, Sys., Inc. v. American Soc. of Comp., Auth. and Pub.,* 320 F.Supp. 389, 392 (S.D. N.Y.1970).

It is well-settled in this Circuit that "a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973). See *Columbia Pictures Indus., Inc. v. American Broad. Cos., Inc.,* 501 F.2d 894, 897 (2d Cir. 1974); *Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692–93 (2d Cir. 1973); *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). For the reasons stated hereinbelow, the Court has concluded that on the present record the moving party has failed to demonstrate either possible irreparable injury or a balance of hardships tipping decidedly in her favor. Accordingly, the preliminary relief sought must be denied.

■ Because the Court has concluded that defendant has failed to satisfy the

second prong of either of the alternative formulations of the test for a preliminary injunction, it is not necessary to examine the merits of the action in detail on this motion. It suffices to note that, having first determined that New York law applies,[5] the Court concludes that the right of the infant to disaffirm the contract is virtually certain.[6] See, *Joseph v. Schatzkin,* 259 N.Y. 241, 243, 181 N.E. 464 (1932); *Casey v. Kastel,* 237 N.Y. 305, 142 N.E. 671 (1924); *Career Placement of White Plains, Inc. v. Vaus,* 77 Misc.2d 788, 354 N.Y.S.2d 764 (Sup.Ct.Westchester Co.1974); *General Motors Acceptance Corp. v. Stotsky,* 60 Misc.2d 451, 303 N.Y.S.2d 463 (Sup.Ct.Suff.Co.1969); *In re Ferguson's Guardianship,* 41 N.Y.S.2d 862 (Surr.Ct.West.Co.), *affirmed,* 266 App. Div. 1016, 46 N.Y.S.2d 222 (4th Dept. 1943). However, the right to disaffirm does not necessarily carry with it the right to obtain the particular relief sought following disaffirmance. See *Pieri v. Nebbia,* 178 Misc. 388, 390, 34 N.Y.S.2d 317 (Co.Ct., Monroe Co.1942).

■ In this case, there are two factors which cast at least some doubt on the right of the infant ultimately to obtain the permanent injunctive relief sought in this action, but which are not appropriately resolved with the case in its present state. The first factor is that the question presented, i. e., whether after a valid disaffirmance, an infant may obtain an injunction against the party with whom she contracted prohibiting any further exploitation by that party of the fruits of the contract, appears to be a question of first impression under New York law. In this Court's view,

---

**5.** Paragraph 17 of the agreement provides that "The validity, construction and effect of this agreement . . . shall be governed by the laws of the State of New York." (Exhibit A.) Neither party has sought to deny that this paragraph expressed the intent of the parties at the time or that New York law should be applied by the Court in the determination of the instant motion.

New York conflict of laws rules, applied by this Court pursuant to the mandate of *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 734, 85 L.Ed. 1115 (1941), give great deference to such an expression of intent in the contract itself. See *Thompson v. Ketcham,* 8 Johns. 189 (1811); 8 N.Y.Jur., Conflict of Laws § 20. Accordingly, the Court determines that New York law should be applied in considering the merits of this motion.

**6.** CBS's two main arguments to the contrary do not withstand scrutiny. The first argument is that the infant may not disaffirm because she cannot place CBS in the status quo ante. However, the cases CBS relies on for this proposition are clearly distinguishable in that they either dealt explicitly with contracts for "necessaries", see *Williams v. Hutchinson,* 3 N.Y. (3 Const.) 312 (1850); *Cidis v. White,* 71 Misc.2d 481, 336 N.Y.S.2d 362 (Dist.Ct.Nas.Co.1972), or can fairly be read as having done so. See *Vichnes v. Transcontinental & Western Air., Inc.,* 173 Misc. 631, 18 N.Y.S.2d 603 (App.Term 1st Dept. 1940). It is well-recognized that contracts for "necessaries" are generally excepted from the rule which allows minors to disaffirm contracts made during infancy. See, e. g., *International Text Book Co. v. Connelly,* 206 N.Y. 188, 99 N.E. 722 (1912); 28 N.Y.Jur., Infants § 20.

The second argument is that the infant may not disaffirm her contract because it has been to her benefit. There can be no doubt that certain decisions of lower state courts have stated that the general rule with respect to a minor's right to avoid contracts "yields to the exception that, where an infant's contract is to his benefit, it is good and binding on him." *Kaufman v. American Youth Hostels,* 13 Misc.2d 8, 174 N.Y.S.2d 580 (Sup.Ct.West.Co.1957), *aff'd as modified,* 6 App.Div.2d 223, 177 N.Y.S.2d 587 (2d Dept. 1958); *Petition of Yonnone,* 72 Misc.2d 579, 339 N.Y.S.2d 212 (Surr.Ct.Orange Co.1972); *In re Taylor,* 153 Misc. 673, 275 N.Y.S. 934 (Surr. Ct.West.Co.1934). However, having examined those decisions and the cases cited therein, this Court has determined that the New York Court of Appeals decision upon which they ultimately rely, *Joseph v. Schatzkin, supra,* does not stand for the rule as stated.

The *Joseph* case held that where no benefit had been received by an infant from the contract being disaffirmed, the infant would be permitted to recover the consideration paid without deduction for benefit received. *Id.* 259 N.Y. at 244–45, 181 N.E. 464. The clear implication of the decision, in this Court's view, is that, had a benefit been received, its value would have been deducted from the consideration recovered by the infant; not that disaffirmance would not have been allowed.

This Court is unable to conclude that New York law precludes an infant from disaffirming a contract, made during infancy, simply because the contract has been of benefit to the infant. See *Foy v. Salzano,* 152 App.Div. 47, 136 N.Y.S. 699 (1st Dept. 1912); 28 N.Y.Jur., Infants § 8.

such questions are best not resolved in the context of a motion for a preliminary injunction. See *Fashion Two Twenty, Inc. v. Steinberg,* 339 F.Supp. 836 (E.D.N.Y.1971); *Oleg Cassini, Inc. v. Couture Coordinates, Inc.,* 297 F.Supp. 821 (S.D.N.Y.1969). The second factor is that CBS has raised a variety of equitable issues by dint of which it challenges the right of the infant to receive equitable relief from this Court. These issues, which involve charges of unclean hands, bad faith, and overreaching on the part of the infant, are met by allegations against CBS of unfair dealing and exploitation. The resolution of such charges and counter-charges will be important in determining the final relief, if any, to be granted each party to this dispute. It is apparent, however, that such matters, involving as they do, numerous factual questions concerning the relationship between the parties, are particularly unsuited to resolution on the incomplete record now before the Court. See *Eastin-Phelan, Corp. v. Hal Roach, Studios, Inc.,* 350 F.Supp. 1328 (S.D. N.Y.1972); *Oleg Cassini, Inc. v. Couture Coordinates, Inc., supra.*

The principal basis for Miss Tucker's claim that she will suffer irreparable harm if she does not receive the relief sought is her claim that since signing to record with MCA, she has embarked on an attempt to achieve a new artistic direction to her career. She hopes to achieve this goal by bringing to her creative product her own decisions as to the selection, arrangement and interpretation of recording material as well as by exercising more control over the packaging and promotion of the material. (Tr. 74–75.) In her judgment—and the Court notes that she was the only witness to testify on behalf of her application—success in this attempt to launch a new direction in her career will enhance her reputation and broaden the base of her appeal to the public. In other words, she hopes to become known not only as a country singer, but as a "pop" singer as well. (Tr. 76.) Failure in this effort, she fears, will impair and otherwise harm her career. (Tr. 76, 83.)

Miss Tucker testified that in her judgment, continued exploitation by CBS of the master recordings which she recorded for CBS during the contractual period will frustrate and otherwise impede her efforts to move in a broader career direction. This will occur, in her opinion, because her older recordings, which she believes are "less commercial", will compete on the market with the new image she is attempting to project. She fears the public will be confused as to the direction of her career if it believes that these old recordings are new Tanya Tucker material. (Tr. 78–79, 83.)

While this argument, i. e., that continued exploitation of Tucker recordings by CBS will damage the infant's career, is novel and appealing in certain respects, its merit must be assessed in the light of the evidence. Further, the argument must be considered separately as to each of the two types of material with respect to which Miss Tucker seeks injunctive relief, that is, previously released and previously unreleased recordings. The Court notes, at this juncture, that it is not called upon for the purposes of this motion to make any independent assessment whatsoever of the merits of either category of material as compared to the material Miss Tucker is now recording. What is before the Court is a legal not an artistic question, to wit, whether the evidence adduced by the moving party meets the standard required for the issuance of a preliminary injunction.

As to previously released material, it is this Court's view that Miss Tucker's argument regarding potential impact on her career has little, if any, force. These recordings are now available to the public; the infant has not sought to enjoin, either preliminarily or permanently, their continued distribution in their present form. Therefore, they will continue to be available to the public, even if the injunction sought should issue; and to the extent that the recordings in their present form continue to sell, the infant may well continue to benefit financially from them.

There was testimony at the hearing that selection of the wrong material or competi-

tion between new and old material may be detrimental to the artist and to the new material. (Tr. 152, 184–85.) However, with respect to the previously released material, the infant is obviously content to risk that competition and have the material remain available to the extent that it apparently suits her purposes. Moreover, Miss Tucker testified at one point in the proceeding that she was not necessarily concerned either with how the recordings were packaged or how they were released. (Tr. 93.) There is no evidence in the record that convinces this Court that re-release of this already available material will cause the infant irreparable harm, simply because it is presented in a new format.

■ As to previously unreleased CBS material, recorded in January, 1975 [hereinafter, the new CBS material], the issues are somewhat different. Determination of whether there has been a showing that release of this material will do irreparable harm to Miss Tucker's career will depend on an analysis of what the evidence introduced at the hearing shows with respect to this previously unreleased CBS material and the new material Miss Tucker now has recorded with MCA.

At the time Miss Tucker recorded the new CBS material, she had already determined to leave CBS and had signed her first contract with MCA. As previously stated, she testified that she had made this decision to switch recording companies largely to be able to exercise a greater degree of control over her career and to set it off in a new direction. (Tr. 74–76.)

Miss Tucker testified that before deciding to make this last set of recordings for the company she was leaving, she consulted with her advisors concerning such matters as the type of material which would be recorded and which would appear on the record album should one be released. (Tr. 119.) Such consultation and concern is not surprising, given the nature of the career decisions she says she had already made. Miss Tucker also testified that she was happy to be working for one last time with Billy Sherrill [Sherrill], who had been the

producer for all her records at CBS and who was regarded by Miss Tucker and others as a great country music producer. (Tr. 95–96, 120, 148.) Sherrill is the person who will have the most to say as to if and when the new CBS Tucker material will be released. (Tr. 136–37.)

The evidence shows that Miss Tucker directly selected some of the songs which were recorded at the January, 1975 session, and participated in the selection of others (Tr. 95–96); Miss Tucker considered at least one of the new CBS songs to be of the type that gets into a little broader field than her previous recordings (Tr. 96), while she considered some of the songs on her MCA album to be country songs (Tr. 88); the new CBS material which was selected by Sherrill was not selected for Miss Tucker with her age in mind (Tr. 134); while Miss Tucker now considers the CBS material to be "less commercial" than her MCA recordings, she has liked the two songs from the January, 1975 recording session which have been released as singles by CBS (Tr. 97); as to those MCA songs he has heard, Sherrill, Miss Tucker's CBS producer, "can't find all that much difference" in the style of her performance. (Tr. 166.) Both Sherrill and Tucker stated that neither could be sure or guarantee that their decisions regarding which songs to record and release would lead to successful records or an advance in Miss Tucker's career. (Tr. 84, 152, 160.) Sherrill also testified, however, that in his experience as a producer the artist is often not the best judge of his or her own material. (Tr. 151–52.)

One can assume that an artist always feels that he or she cannot be satisfied with past efforts and wants to improve with each effort, to move beyond the work that has gone before. The Court has no trouble with crediting the sincerity of the feelings expressed by Miss Tucker in this regard. However, giving credence to Miss Tucker's view that her new material is superior to the old—even the old which was recorded less than one year ago—is quite different from concluding that release of the old material will cause irreparable harm to Miss

Tucker's career. The evidence on this motion, principally from the mouth of the artist herself, simply does not support the view that the new CBS material is of such a distinctly different and inferior character when compared with the work she is now doing that its release would be even reasonably likely to do damage to her career.

Likewise, the Court has no difficulty crediting the sincerity of Miss Tucker's feelings that her career belongs to her, not to anyone else, that she wants to exercise control over it, and that she wants to make the decisions which shape it, even if in the long run those decisions might turn out to be wrong. (Tr. 74–75, 80, 84.) A desire to control one's own destiny is a feeling common no doubt to artists and nonartists alike. It is a feeling, however, which is beside the point with respect to the legal issues before the Court. Counsel for the defendant has been unable to direct the Court to any legal authority to support his urgently advanced position that an artist has a particular right, which should be recognized by this Court, to control the direction of her own career, despite the realities of contractual relationships and like obstacles. Nor has the Court found any support for this view. A finding of irreparable harm can hardly be based simply upon the fact that this individual cannot control circumstances in the way in which she would like to. Cf. *Heldman v. United States Lawn Tennis Association, supra,* at 1251.

In sum, the Court is unable to conclude that the evidence put forth by Miss Tucker as to the damage which might be done to her career by the release of the new CBS material, demonstrates such a likelihood of irreparable harm resulting from confusion in the public mind as to the direction of Miss Tucker's career that a preliminary injunction should issue in this case. Indeed, a substantial portion of the testimony from Miss Tucker herself lends support to the view that what Miss Tucker objects to is not the fact of the release of this material, as contended on the instant motion, but rather the method and timing of its release,

distribution, and promotion. (Tr. 75–77, 83, 93–94, 98, 126–27.)

■ Miss Tucker's other assertions of irreparable harm can be disposed of in more summary fashion. She apparently fears that sale and distribution of new and previously issued CBS material will saturate the market, competing with and hurting the sales of her MCA recordings. (Tr. 79, 83.) To the extent that this claim raises issues which differ from those already discussed, it appears to focus on a potential loss of earnings. There is some doubt as to whether there would be any loss of earnings at all, at least if Miss Tucker retains the right to receive royalties from the sales of her CBS records. In any event, this type of financial harm is compensable in money damages and is not the sort of harm which traditionally will support the issuance of a preliminary injunction. See *Sampson v. Murray,* 415 U.S. 61, 89–90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166, 186 (1974).

■ A final basis for Miss Tucker's request for injunctive relief is her fear that CBS will engage in "dumping" of its Tanya Tucker recordings. "Dumping" apparently refers to a practice described by Billy Sherrill as "putting records out without regard to label of the artist or content of the material or the quality of the material." (Tr. 140.)

To the extent that this matter was explored at all at the hearing, it was through Sherrill's testimony. He stated that he had not engaged in the practice. (Tr. 140.) No evidence was offered to show that CBS, through Sherrill or anyone else, was "dumping" Tanya Tucker material, or that it was about to do so, or, for that matter, that it had ever engaged in this practice with respect to any artist. In short, while one might speculate as to harm which could result from such a practice, there is absolutely no evidence in this record from which to conclude that "dumping" of Tucker recordings is occurring now or is likely to occur in the future.

■ Counsel for the defendant contends that even if Miss Tucker does not

show irreparable harm, there can be no question that she must prevail on the balance of hardships because of the plaintiff's minimal showing as to any damage it will suffer if an injunction issues. The Court agrees with counsel that any hardship CBS has shown it is likely to suffer appears to be minimal. There is the possibility, of course, that if an injunction should issue CBS would be prevented from putting out certain records and would therefore lose sales. This type of loss is surely compensable in money damages and therefore can be accorded only limited weight in this proceeding. CBS alleged at the hearing that it had already suffered damage to its reputation by virtue of a misleading and inaccurate report which had appeared in *Cashbox* magazine concerning the temporary restraining order issued in this case. The significance of this event can be dismissed without even considering the nature of the harm which might have occurred. It would be novel indeed for a court to stay its hand somehow because of the possibility that the news media might misinterpret court action, to the detriment of one of the parties.

 While the Court can agree, therefore, with the assertion of defendant that plaintiff has made only a minimal showing as to any harm which it would suffer from issuance of a preliminary injunction, the Court cannot agree with the conclusion that this entitles defendant to the relief sought on this motion. The balancing test, as articulated in this Circuit, requires a balance of hardships tipping *decidedly* in favor of the party seeking relief. See cases cited, supra at 1225. In this Court's view, the word "decidedly" is the key to interpreting the measure of harm required to satisfy this portion of the test. It must be taken to mean that, whatever the potential harm shown by the party opposing the motion, the burden remains on the moving party to demonstrate something like that quantum of harm which has traditionally been required to justify issuance of a preliminary injunction. See Wright & Miller, Federal Practice and Procedure: Civil § 2948 at 431 and cases cited therein.

 Speculative injury will not support the issuance of a preliminary injunction. See, e. g., *Roy Export Co. Establishment v. Trustees of Columbia Univ.*, 344 F.Supp. 1350 (S.D.N.Y.1972); *Heldman v. United States Lawn Tennis Association, supra.* Surely the fact that any injury to the party opposing the motion is also speculative does not detract from the force of this principle.

 This conclusion is consistent both with the view that preliminary injunctive relief constitutes an extraordinary remedy and with the view that requirements as to showing of harm and showing of likelihood of success are dependent variables. See *Sanders v. Air Line Pilots Association, Int'l, supra; Checker Motors Corp. v. Chrysler Corp., supra; Heldman v. United States Lawn Tennis Ass'n, supra.*

The authority which most nearly supports the position advanced by the defendant on this motion is the case of *Simon v. Edward B. Marks Music Corp.*, Index No. 2873/72 (Sup.Ct.1972), aff'd, 41 A.D.2d 730, 341 N.Y. S.2d 866 (1st Dept. 1973). In that case, a preliminary injunction against further sale or distribution of a recording by recording artist Paul Simon was issued by the trial court on a finding that, in addition to probable success on the merits, the plaintiff artist had shown that the record in question "was made . . . at a time when he was not popular and when his voice and talent may not have been as experienced as at the present time." The Appellate Division affirmed, concluding that "a clear right to the injunction was shown with respect to the phonograph records." *Id.*

 Unfortunately, neither the order of the trial court nor the appellate court's affirmance set out the facts of the case. The issuance of a preliminary injunction must be based on the particular facts of the case under consideration. Whatever might have been the conclusion of the state court in a case, the record of which is not available to this court, it is this Court's conclusion that on the record presented here, the defendant has not shown that she is entitled to the extraordinary relief sought.

Accordingly, the temporary restraining order entered in this case is vacated and the motion for a preliminary injunction is denied.

SO ORDERED.