**CAPITAL NATIONAL BANK OF NEW YORK and Capital National Bank of New York as Assignee and Successor-In-Interest to Juan Miranda and Jim Restaurant Corp., Inc., Plaintiff,**

v.

**McDONALD'S CORPORATION and McDonald's Business Facilities Corporation, Inc., Defendants.**

No. 84 Civ. 7238 (GLG).

United States District Court,
S.D. New York.

Jan. 8, 1986.

Lester A. Lazarus, P.C., New York City, for plaintiff; Harvey F. Friedman, of counsel.

Davis, Markel, Dwyer & Edwards, New York City, for defendants; Steven M. Edwards, Paula Lambert Liang, of counsel.

## OPINION

GOETTEL, District Judge.

Before the Court are the motions of defendants McDonald's Corporation and McDonald's Business Facilities Corporation, Inc. (collectively "McDonald's") to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), or, in the alternative, for summary judgment under Fed.R.Civ.P. 56, and for sanctions, including reasonable attorney's fees, under Rules 11 and 37(c) of the Federal Rules of Civil Procedure. For the reasons stated below, the defendants' motions are granted in part and denied in part.

## I. BACKGROUND

In 1978, Juan Miranda, the assignor of the plaintiff, Capital National Bank ("Capital"), applied for a McDonald's fast food franchise and submitted the requisite information on employment and financial status. Based on that information, in July 1980, McDonald's awarded Miranda a "business facilities lease" franchise for a restaurant located in a minority neighborhood in Philadelphia. A business facilities lease franchise requires a smaller initial investment than a conventional franchise because McDonald's purchases and owns the furniture, fixtures, and equipment. In November 1981, Miranda and McDonald's entered into a second business facilities lease franchise agreement for another store in Philadelphia.

For each franchise, Miranda received and assented to three documents: a franchise letter agreement, an operator's lease, and a license agreement. According to the documents, McDonald's could terminate the franchise upon Miranda's failure (1) to pay monthly rent and service fees, (2) to pay his suppliers, (3) to pay taxes, or (4) to submit monthly financial reports. The documents also expressly prohibited the assignment of any interest in the franchises without McDonald's consent.

At approximately the same time Miranda received each franchise, he applied for and obtained secured loans in the amount of $115,000 from Capital to cover his initial costs. Capital executed Uniform Commercial Code ("UCC") financing statements in connection with these loans. McDonald's knowledge of and acquiescence in these financing arrangements is disputed by the parties.

On October 10, 1983, McDonald's notified Miranda that it was terminating his franchise. The parties dispute the reasons for the termination. McDonald's asserts that, by early 1983, Miranda had begun to fall behind in his payments to suppliers and to McDonald's, that he had not filed withholding tax returns since January 1982, and that he owed various taxing authorities in excess of $180,000. Miranda, on the other hand, submits that some of his financial problems, if they in fact existed, were due to McDonald's own conduct. He also states that he had worked out a payment schedule with his suppliers under which he remained current through the time of termination, and that he had filed timely monthly statements, obtained a deferral of payments to Capital and to McDonald's, and arranged a tax payment agreement with the tax authorities. Miranda asserts that the termination was unwarranted in light of these financial arrangements. He also asserts that he was given no opportunity to consult with his attorney before the termination, and that he was denied the use of the Ombudsman Procedure, a method by which franchisees may air their grievances. After the termination, Miranda filed for bankruptcy.

On November 16, 1983, Capital notified McDonald's that it had a perfected security interest in Miranda's business. In October 1984, Capital commenced this action, as Miranda's assignee and successor-in-interest, and on its own behalf, seeking over two million dollars in damages based on three claims: (1) the wrongful termination of Miranda's franchises, (2) the conversion of Capital's collateral, and (3) the "willful and wrongful violation of the applicable laws, rules, and statutes." Complaint ¶ 18. On December 3, 1984, McDonald's moved

for a more definite statement of the pleadings.

On January 30, 1985, Capital provided McDonald's with a more definite statement in the form of a proposed amended complaint that sought more than $100 million in damages. It contained the following 11 claims: (1) the same wrongful termination claim; (2) the same conversion claim; (3) a claim for alleged refusal to permit Miranda to utilize McDonald's Ombudsman procedure; (4) a claim that the Notice of Termination violated the Illinois Franchise Disclosure Act by not giving Miranda the opportunity to cure defaults; (5) a claim for violations of the thirteenth amendment and 42 U.S.C. § 1981 on the ground that McDonald's engaged in racial discrimination in granting, implementing, and terminating franchises; (6) a claim that McDonald's violated the thirteenth amendment and 42 U.S.C. § 1982 by terminating Miranda's franchise for discriminatory reasons; (7) a claim that McDonald's practice of racial discrimination violated the price discrimination provision, section 704.2, of the Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½, § 704.2 (1981); (8) a claim that McDonald's engaged in a racially discriminatory refusal to deal with Miranda, and through a restrictive covenant in the franchise agreement prohibited Miranda from engaging in any other food or restaurant business, thereby violating the antitrust laws; (9) a claim that McDonald's violated the Sherman Act by confining Miranda's franchises to minority neighborhoods; (10) a claim that McDonald's attempted to monopolize the hamburger business for white persons by only granting franchises in white neighborhoods to whites; and (11) a claim for tortious breach of contract.

On February 12, 1985, McDonald's filed a supplemental memorandum pursuant to Fed.R.Civ.P. 11, notifying both the Court and Capital of its intention to seek sanctions on the grounds that Capital had no basis in law or fact to assert its civil rights or antitrust claims. Later in February 1985, the Court granted McDonald's motion for a more definite statement and granted the plaintiff leave to file an amended com-plaint in lieu of such a statement. On April 29, 1985, Capital filed an amended complaint, identical to the proposed amended complaint. It is this complaint that McDonald's now seeks to dismiss in its entirety. McDonald's contends that all of the claims that Capital asserts as Miranda's assignee must be dismissed because Miranda did not, and could not, assign the claims to Capital. McDonald's also argues that all of Capital's claims brought on its own behalf must be dismissed because Capital has no standing to bring those claims.

## II. DISCUSSION

### A. Capital's Suit as Assignee of Miranda

Capital asserts its claims pursuant to a "General Loan and Security Agreement" (the "security agreement") that Miranda executed as collateral for the loans he obtained from Capital. Capital contends that the security agreement assigns it the right to pursue those claims. McDonald's contends that, under New York law, Miranda could not assign any such rights. It also argues that the franchise agreement prohibited any such assignment.

As noted above, Miranda signed three different franchise agreements when he obtained each franchise. By their terms, all three appear to prohibit any type of assignment. The franchise letter agreement, ¶ 8, provided that "no other ... corporation [besides the franchisee] shall acquire any interest, whether direct or indirect, hereunder ... without McDonald's prior written consent." Defendant's Notice of Motion, Exhibits F & G. The operator's lease, ¶ 4.06, similarly provided that the "[l]essee shall not ... assign, convey, mortgage, pledge, or encumber this lease or any interest hereunder ... without ... obtaining Lessor's prior written consent." Defendant's Notice of Motion, Exhibits H & I. Finally, ¶ 15 of the license agreement stated, "Without the prior consent of the Licensor, Licensee's interest in the license shall not be assigned...." Defendant's Notice of Motion, Exhibits J & K.

■ The security agreement granted Capital a security interest in:

All of the debtor's presently owned and future accounts, contract rights, instruments, general intangibles, inventory, furniture, fixtures, and equipment, wheresoever located, as such terms are defined in the New York Uniform Commercial Code, and all other personal property ... whether now or hereafter existing or now owned or hereafter acquired ... including credits, claims, demands....

Miranda Affidavit, Exhibit A. In addition to its clear assignment of Miranda's inventory, Capital maintains that this agreement assigned it the right to pursue all of the other claims it asserts herein on Miranda's behalf. Capital concedes that it did not enter into a separate agreement with Miranda to pursue his choses in action against McDonald's,[1] but asserts that this general security interest includes an assignment of any choses in action.[2] In addition, Capital asserts that this broad assignment did not violate the franchise agreements or interfere with McDonald's rights thereunder.

■ The scope of Miranda's assignment must be determined in accordance with New York law, as the assignments were executed in New York. *American Optical Co. v. Curtiss*, 56 F.R.D. 26 (S.D.N.Y.1971) (validity of assignment determined by law of place where executed). The security interest granted by Miranda to Capital is subject to the definitions and limitations of Article 9 of the New York Uniform Commercial Code ("N.Y.U.C.C."), which applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general

intangibles, chattel paper or accounts...." N.Y. U.C.C. § 9–102 (McKinney Supp.1984).

The security interest's reference to items other than inventory, including furniture, fixtures, and equipment, is ineffective. Under the franchise agreement entered into by Miranda, a business facilities lease, the inventory was the only restaurant property he owned. McDonald's owned the furniture, fixtures, equipment, and land. At the time of Miranda's termination, the inventory was valued at $12,000.[3]

In addition, although the security interest speaks of "accounts [and] contract rights," Miranda apparently had no such rights to assign. As defined by the N.Y. U.C.C., an account is "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." N.Y. U.C.C. § 9–106 (McKinney Supp.1984).[4] Miranda had no "accounts" due from McDonald's; the only thing he received from McDonald's was the franchise itself.

■ Capital apparently suggests that the agreement's reference to "general intangibles" authorizes the assignment of this lawsuit thereby permitting it to sue McDonald's for over $100 million in damages, rather than seeking its own much more modest losses. Section 9–106 of the N.Y. U.C.C. defines general intangibles as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." N.Y. U.C.C. § 9–106 (McKinney Supp.1984). The Official Code Commentary to this section's predecessor states that general intangibles are "miscellaneous contractual rights and other personal property

---

**1.** Apparently, Capital asked Miranda's attorney for these rights, but he refused to assign them to Capital.

**2.** A chose in action is "[a] personal right not reduced into possession, but recoverable by a suit at law." Black's Law Dictionary 305 (5th ed. 1979).

**3.** Miranda valued it at $12,000, but McDonald's valued it at $8,917.46, and offset that amount against Miranda's indebtedness.

**4.** In 1977, section 9–106 amended, and the reference to contract rights was omitted. Prior to that time, a "contract right" was defined as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." N.Y. U.C.C. § 9–106 (McKinney 1972).

which are used or may become customarily used as commercial security." Official Comment, N.Y. U.C.C. § 9–106 (McKinney 1969). By its terms and its purpose, the statute appears to include choses in action.

Capital argues that choses in action are freely assignable. However, the assignability of choses in action is not as unlimited as Capital would suggest.[5] First, the holder of a security interest in a chose in action has only a "qualified interest in the assigned chose, commensurate with the debt or liabilities secured, even though the assignment appears to be absolute on its face." *Beaconwear Clothing Co. v. United States*, 355 F.2d 583, 590, 174 Ct.Cl. 40 (1966). Capital's interest in any claim is therefore limited to approximately $115,000, the maximum extent of Miranda's indebtedness.

Second, one can only assign a chose in action that is sufficiently choate. A claim that has already accrued or is fully matured is assignable. *Stathos v. Murphy*, 26 A.D.2d 500, 276 N.Y.S.2d 727 (1st Dep't. 1966). A portion of an expected recovery in a pending lawsuit is also assignable as a general intangible. *See Friedman, Lobe & Block v. C.L.W. Corp.*, 9 Wash.App. 319, 512 P.2d 769 (1973). However, the "assignment of a truly future claim or interest does not work a present transfer of property. It does not because it cannot; no property yet exists." *Stathos v. Murphy, supra*, 276 N.Y.S.2d at 730. The choses in action claimed by Capital are such truly future interests; they did not exist at the time Miranda executed the security agreement, and were not specifically referred to therein. It appears that there was no intent to assign them.[6] At the time Capital acquired its security interest, there was no reason to believe that antitrust and civil rights claims would arise. In fact, these and other claims contained in the complaint owe their existence to the dubious creativity of an attorney seeking the repayment of a bad loan made by his client. The choses in action currently pursued by Capital cannot be the sort of "personal property ... *customarily* used as commercial security." Official Comment, N.Y. U.C.C. § 9–106, *supra* (emphasis added). A breach of contract claim that existed at the time a security interest was granted, then unbeknownst to the creditor, does not "partake of the requisite nature of collateral to which a security interest may adhere." *Williamston Pants Co., Inc. v. Bankers Trust Co.*, 68 A.D.2d 811, 413 N.Y.S.2d 936, 938 (1st Dep't.1979). Capital's claims, which are even more remote, cannot constitute such collateral.

The security agreement, then, did not assign to Capital the right to assert most of the claims contained in the complaint. In light of this finding, we need not reach the legal merits of those individual claims. We must, however, discuss the status of Capital's security interest in the inventory, the only franchise-related property encompassed by the security interest. We must determine the effect of the franchise agreement's anti-assignment clauses on that security interest and the claims that arise from it.

■ Initially we must determine whether the law of New York or Illinois controls. McDonald's asserts that questions as to the interpretation of the franchise agreements, and whether assignments could be made thereunder, should be governed by Illinois law since the franchise agreements provide that Illinois law shall govern all disputes. The plaintiff has not spoken to the choice of law issue.

---

5. Capital relies on *Liberty Mutual Insurance Co. v. Davis*, 412 F.2d 475, 484 (5th Cir.1969), to support this argument. Capital's reliance is misplaced. In *Liberty Mutual* an insured assigned to an injured claimant the insured's cause of action against an insurer for failure to settle. Assignment is favored in such cases in order to provide a remedy to an injured party who has been awarded damages against a judgment-proof debtor, when the debtor's only valuable asset is his claim against his insurer. Assignment in such cases also prevents insurers from neglecting or strong-arming their less affluent policyholders. Those policies are not implicated in this case.

6. *See supra* note 2, and accompanying text.

The Court sees no reason to depart from the parties' contractual choice of law. Under New York choice of law principles applicable in this diversity action, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the contractual selection of governing law is generally determinative so long as the chosen state has sufficient contacts with the transaction, absent fraud or violation of public policy. *See CBS, Inc. v. Tucker*, 412 F.Supp. 1222, 1226 n. 5 (S.D.N.Y.1975); *Hawes Office Systems, Inc. v. Wang Laboratories, Inc.*, 537 F.Supp. 939, 942 (E.D. N.Y.1982). *See also Restatement (Second) of Conflict of Laws* § 187 (1971).[7] The New York courts have enforced contractual choice of law provisions when the parties have had little contact with the chosen state. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F.Supp. 765, 768 (E.D. N.Y.1978), *aff'd in part and rev'd in part*, 604 F.2d 737 (2d Cir.1979); *Fleischmann Distilling Corp. v. Distillers Co. Ltd.*, 395 F.Supp. 221, 229 (S.D.N.Y.1975). In the instant case, the matter in controversy is sufficiently related to Illinois, the chosen state. McDonald's is an Illinois resident and Miranda sent his payments of rent and other fees to McDonald's headquarters there. Not only are the contacts sufficient, but, in addition, other policy reasons support our decision to uphold the parties' choice. Because McDonald's enters into a substantial number of franchise agreements in various states, it has an interest in having those agreements governed by one body of law. Following its contractual choice of law will effectuate its intent. We will, therefore, apply Illinois law to determine the validity of the assignments under the franchise agreements.

Capital does not contest the validity[8] or the voiding effect of the anti-assignment clauses under Illinois law, but contends that its security interest did not violate those provisions. It asserts that because the first loan transaction took place before Miranda obtained the first franchise, Capital's security interest in the franchise inventory did not conflict with McDonald's rights and could co-exist with them.

A number of different documents purport to control the parties' rights. First, the security agreements executed by Miranda, perhaps before and certainly after he obtained the franchises, reference the inventory and speak of presently existing and after-acquired property. Capital later perfected its security interests. Second, the anti-assignment provisions of the three different franchise agreements seek to void any interest, including a security interest, obtained by any entity other than the franchisee without McDonald's consent. Third, the same franchise agreements give McDonald's the right to seize any inventory upon termination and apply it to a franchisee's outstanding indebtedness. Operator's Lease, ¶ 3.06; Defendant's Notice of Motion, Exhibits H & I. McDonald's claims that at the time of Miranda's termination, he owed McDonald's approximately $59,000.

This situation is not unlike that in which the priority of competing creditors is at issue. We cannot, however, reach the priority issue at this time. Questions of fact exist as to when the first security interest arose, and what inventory is actually covered, *i.e.*, whether it covered the inventory on both restaurant premises at the time of termination,[9] and whether the anti-assign-

7. N.Y. U.C.C. § 1–105(1) (McKinney Supp.1984) also permits parties to transactions to agree to apply the law of a particular state if the transaction bears a "reasonable relation" to the chosen state.

8. Even if Capital contested the validity of the anti-assignment clauses, it would not succeed. There is little question that these provisions are valid. *See, e.g., Seligson v. Plum Tree, Inc.*, 361 F.Supp. 748 (E.D.Pa.1973); *Security National*

*Bank v. General Motors Corp.*, 345 Mass. 434, 187 N.E.2d 820 (1963).

9. We are only concerned with the first security agreement. The second security agreement arose after the second franchise was awarded to Miranda, at which time Capital should have been aware of the nonassignability clauses. Those clauses prevented Miranda from assigning to Capital any rights in franchise property.

ment clauses applied to pre-existing security interests. We may not grant summary judgment when contractual language is subject to different interpretations and when issues of fact exist as to the timing of the various contracts. *See, e.g., Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 (2d Cir.1983); *Flli Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563, 566 (2d Cir.1977). Moreover, the parties have not addressed the issue of priority, except to state their respective entitlements. McDonald's motion for summary judgment on those claims relating to the inventory and its alleged conversion is, therefore, denied. It's motion for summary judgment on all of Capital's other claims as Miranda's assignee is granted.

### B. Capital's Suit On Its Own Behalf

Capital is also suing on its own behalf, contending that it has suffered injury as a result of McDonald's wrongful termination of Miranda's franchises and conversion of the restaurant property. More specifically, Capital asserts that McDonald's actions impaired its collateral. McDonald's challenges Capital's standing to sue for wrongs allegedly suffered by Miranda, wrongs that form the basis of each of Capital's eleven causes of action.

### 1) The Antitrust Claims

Capital's eighth, ninth, and tenth causes of actions allege violations of the antitrust laws. Capital asserts that McDonald's illegally and unreasonably placed restrictive and anticompetitive provisions in the franchise agreements, and restricted the locations of Miranda's franchises to minority neighborhoods. Capital also alleges that McDonald's attempted to monopolize the Philadelphia hamburger business for itself and for white persons. Capital claims lost profits and other damage in the amount of $30 million on these claims. In addition, in its seventh cause of action, Capital alleges that this racial discrimination violates section 704.2 of the Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½ § 704.2 (1981), which prohibits discrimination between franchisees "in the charges offered or made for franchise fees, royalties, services...." Capital claims actual damages of $5 million and punitive damages of $50 million on this claim. We treat it as an antitrust claim, because section 704.2 relates to commercial practices such as price discrimination. McDonald's asserts that Capital does not have standing under the antitrust laws to bring these claims and that Capital has not alleged the requisite "antitrust injury."

Section 4 of the Clayton Act confers a private cause of action upon "any person who shall be injured in his business of property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15 (1982). The Supreme Court has stated that the standing analysis requires an examination of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983). The Supreme Court has identified several factors that should guide the standing inquiry. Factors weighing against a grant of standing include the speculative nature of the damage theory alleged, the risk of duplicative recoveries, and the danger of complex apportionment of damages. Those that counsel for a grant of standing are the directness of the asserted injury, the presence of an improper motive for the conduct alleged, and the manageability of the resulting litigation. *Id. See also Triple M. Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 247 (2d Cir. 1985) (listing factors). Most of these factors militate against granting standing to Capital. None counsel for such a grant. Capital is not the direct victim of McDonald's allegedly anticompetitive conduct. There is great potential for duplicative recoveries because Miranda, the true victim, could also sue McDonald's (though the possibility of such a suit is diminished somewhat by no bankruptcy filing). Moreover, the relationship between the conduct alleged and Capital's injury is speculative at best; any number of things could have caused Miranda's insolvency and Capital's

subsequent difficulties in obtaining repayment of its loans. Capital is merely a bank that loaned money to a participant in the fast food market. Capital is an indirect victim of any possible antitrust violation. Capital is not an appropriate complainant to bring this action. *See In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 520 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983) ("[A]s a general rule, stockholders, employees, and creditors of an injured company ... have all been denied recovery because their injuries were too 'indirect,' 'secondary,' or 'remote.'"). Since we find that Capital does not have standing to assert the antitrust claims in its amended complaint, we need not reach the question of whether Capital has suffered antitrust injury.

### 2) The Civil Rights Claims

■ In its fifth and sixth causes of action, Capital seeks $4 million in damages for violations of the thirteenth amendment and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 & 1982 (1982). Capital alleges that McDonald's engaged in racially discriminatory practices in granting, implementing, and terminating its franchise contracts, and that this unlawful action damaged its collateral. McDonald's challenges Capital's standing to assert these claims, which rest only on a "ripple" theory, *i.e.,* that McDonald's violated Miranda's constitutional rights and that Miranda's injuries, in turn, had an effect on Capital's security interest.

Ordinarily, a party has no standing to assert the civil rights claims of third persons. *See e.g., Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976); *Sterngass v. Bowman,* 563 F.Supp. 456, 459 (S.D.N.Y.1983), *aff'd,* 742 F.2d 1440 (2d Cir.1983). Although there are a number of exceptions to this rule, none apply to this case. This is not a case in which an adjudication of the rights of third parties is necessary to an adjudication of the constitutional controversy between the parties at bar. *See Regents of University of Minnesota v. National Collegiate Athletic Association,* 560 F.2d 352,

364 (8th Cir.1977), *cert. dismissed,* 434 U.S. 978, 98 S.Ct. 600, 54 L.Ed.2d 472 (1977). No such constitutional controversy exists. Nor is this a case in which the right sought to be protected—Miranda's right to be free from racial discrimination—would be forfeited if the aggrieved party were forced to appear on his own behalf. *See NAACP v. Alabama,* 360 U.S. 240, 79 S.Ct. 1001, 3 L.Ed.2d 1205 (1959).

Capital's situation is closest to the exception formulated in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). In that case, a party, whose property deprivation was the indirect result of a constitutional deprivation of an absent party, was permitted to raise the issue of the absentee's rights upon seeking to enjoin the application of the state law in question. That case, however, is distinguishable, as it involved an unconstitutional state action, and a party who sought only to forestall enforcement of an unconstitutional law not to recover for another's injury.

Capital lacks standing to assert these civil rights claims on its own behalf.

### 3) The Breach of Contract Claims

■ Capital's first, third, fourth, and eleventh causes of action allege wrongful termination, denial of use of an "Ombudsman Procedure," termination in violation of section 704.3 of the Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½, § 704.3 (1981), and tortious breach of contract, respectively. Although framed differently, these causes of action effectively state one claim: that McDonald's breached its contracts with Miranda when it wrongfully terminated his franchises. Capital claims that it has suffered injury as a result of these breaches.

McDonald's contends that Capital may not assert the breach of contract claims on its own behalf because it is not in privity of contract with McDonald's and is not a third-party beneficiary of the contract. We agree.

Contract remedies exist to give injured parties the benefit of their bargain. *See*

*County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 63 (2d Cir.1984); *Martin v. Julius Dierck Equipment Co.,* 43 N.Y.2d 583, 589, 374 N.E.2d 97, 403 N.Y. S.2d 185, 188 (1978). Absent a contractual relationship, there can be no contractual remedy. *Id.* Capital has no such relationship with McDonald's; it is neither in privity with McDonald's nor is it a third-party beneficiary of the franchise agreements between McDonald's and Miranda. To succeed on a third-party benefit theory, a nonparty must be an intended and not merely an incidental beneficiary of the contract. *Owens v. Haas,* 601 F.2d 1242, 1250 (2d Cir.1979), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Reiner v. West Village Associates,* 600 F.Supp. 233, 239 (S.D.N.Y.1985) *aff'd,* 768 F.2d 31 (2d Cir.1985); *Lawrence v. Fox,* 20 N.Y. 268 (1859). The franchise agreements were not intended to benefit Capital. Indeed, the intent of those agreements was to avoid any possible benefit Capital might claim. Capital does not have standing to assert the breach of contract claims on its own behalf.

### 4) The Conversion Claim

Capital's second cause of action asserts that McDonald's converted its collateral, valued at $150,000. We first note that the only property that McDonald's could have converted, was approximately $10,000 in inventory that was on hand at the time of the termination. We defer decision on whether Capital may assert this conversion claim until it is determined whether Capital had any interest in that inventory, and whether that interest was superior to McDonald's.

### C. McDonald's Motion for Sanctions

McDonald's has requested sanctions, including reasonable attorneys fees, under Rules 11 and 37(c) of the Federal Rules of Civil Procedure, and under 28 U.S.C. § 1927 (1982) and 42 U.S.C. § 1988 (1982). McDonald's asserts that Capital's claims were frivolous and without any legal basis. Any time a party sues for a thousand times its actual losses (increasing its claims fifty

fold in response to a request for a more definite statement of already exaggerated claims), an attempt to abuse the litigation process may have occurred. However, since we have not dismissed the entire complaint, it is premature to consider McDonald's application for attorneys fees under Rule 11 at this time.

### III. CONCLUSION

For the foregoing reasons, McDonald's motion to dismiss is granted with respect to all claims except those relating to the conversion of the inventory. McDonald's motion for sanctions is denied at this time without prejudice to its reconsideration at a later date.

SO ORDERED.